IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CHRISTOPHER EMERSON, CHRISTOPHER B. CRANE-EMERSON BY HIS FATHER AND NEXT FRIEND, CHRISTOPHER EMERSON, AND GABRIELLA CRANE-EMERSON BY HER FATHER AND NEXT FRIEND, CHRISTOPHER EMERSON, <br><br> Plaintiffs <br><br> vs. <br><br> MASS GENERAL BRIGHAM, INC. <br><br> Defendant | No. |

"…if running with dialysis will cause her health down." - The Paper Towel Diagnosis

**PLAINTIFF'S ORIGINAL COMPLAINT**

Christopher Emerson and his children, Christopher B. Crane-Emerson and Gabriella Crane-Emerson, by and through their undersigned counsel, Red Sneaker Law, PLLC, as and for their respective claims against Mass General Brigham (MGB) hereby allege:

**PRELIMINARY STATEMENT**

1. This is a civil rights lawsuit brought under the Americans with Disabilities Amended Act and the Rehabilitation Act in order to bring equality to the healthcare provided by one of America's

leading teaching hospitals that, even in this day and age, still relies on handwritten notes, occasionally written on paper towels, between doctors and deaf patients as a "reasonable accommodation."

2. According to a study performed and released by MGB itself:

   a. More than a third of physicians knew "little or nothing about their legal responsibilities to patients under the ADA."

   b. More than 70 percent of physicians did not know who determines "reasonable accommodations" for people with disabilities.

   c. More training was needed for physicians as to the ADA.

3. This case highlights what MGB already knows but won't admit; that it is failing the Deaf Community. In short, MGB, despite its stellar international reputation, when presented with the Emerson's complaints about not providing ASL interpreters at necessary medical events, determined that physicians who, for example, write notes, on paper towels, such as "if running with dialysis will cause her health down" to deaf patients and families, rather than using a qualified and trained ASL interpreter, have acted appropriately.

4. This lawsuit seeks to end that type of deliberate indifference to the Deaf Community.

## JURISDICTION

5. This Court has Federal Question Jurisdiction pursuant to 28 USC § 1331, as this action is based upon two important federal statutes; the Americans with Disabilities Act, Tittle II, 42 USC § 12131 et. seq. and Title III, 42 USC § 12181 et. seq. and the Rehabilitation Act, 29 USC § 794, Section 504.

## VENUE

6. Venue is proper in the United States District Court for the District of New Hampshire pursuant to 28 USC § 1391(b)(1) as the Defendant, MGB, has been "engaged in the continuous and systematic pursuit of general business activities" in the State of New Hampshire for since, at least, 2017 and, therefore, as a corporation, is a resident of this District giving this Court general

jurisdiction. These activities include operating Wentworth-Douglass Hospital, the Mass General Brigham Integrated Care facility in Salem, New Hampshire, as well as a longstanding affiliations with Southern New Hampshire Medical Center and Elliot Health System. Further, evidencing its New Hampshire residency and extending this Court's general jurisdiction, Mass General Brigham has no fewer than 12 business entities registered with the New Hampshire Secretary of State's office.

7. Plaintiffs were, at all relevant times, and are currently, New Hampshire residents.

## JURY TRIAL DEMANDED

8. Plaintiffs demand a trial by jury on each of the causes of action.

## PARTIES

9. Defendant Mass General Brigham, Inc. is a foreign nonprofit corporation with a principal business address of 800 Boylston Street, Boston, MA 02199 which operates Massachusetts General Hospital in Boston, Massachusetts. Massachusetts General Hospital is a "public accommodation" as defined in 42 U.S.C. § 1281(7)(F) and its implementing regulation, 28 C.F.R. § 36.104 because it is a private entity that operates a place of public accommodation, specifically, a hospital.

10. Plaintiff Christopher Emerson, the father of Christopher B. Crane-Emerson and Gabriella Crane-Emerson and widower of Glenys Crane-Emerson, is profoundly, prelingually deaf and resided, at all material times, at 96 Salmon Falls Road, Rochester, NH 03868. Mr. Emerson is an individual with a disability within the meaning of ADA 42 U.S.C. § 12102(1) and its implementing regulation at 29 C.F.R. Part 36 as Mr. Emerson is prelingually Deaf and communicates, primarily, through his first language, American Sign Language (ASL).

11. Plaintiff Christopher B. Crane-Emerson is the minor child of Plaintiff Christopher Emerson and is, then, a Child of Deaf Adult (CODA). At all material times, Christopher B. Crane-Emerson resided with his father.

12. Plaintiff Gabriella Crane-Emerson is the minor child of Plaintiff Christopher Emerson and is, then, a Child of Deaf Adult (CODA).  At all material times, Gabriella Crane-Emerson resided with her father.

## FACTS

### STATEMENT OF FACTS AS TO THIS CASE

13. In July of 2019, Glenys Crane-Emerson began treatment at Frisbie Memorial Hospital.  Her treatment there is described fully in *Christopher Emerson et al v. Frisbie Memorial Hospital, 1:22-cv-266-JL* which was filed in this Court last month.

14. Eventually, Glenys, who was dying of liver failure, became too sick for Frisbie and she was transferred to Dartmouth Hitchcock Medical Center, which did a wonderful job providing the family with accommodations, and then to Defendant MGB's hospital.

15. Glenys remained in Defendant MGB's hospital for nearly a month before returning back to Frisbie for hospice care on August 26, 2019.

16. During that month, MGB will say they provided the Emersons with "an extraordinary amount of services;" over 100 interactions with interpreter services.

17. The vast majority of those interactions were not for actual treatment, diagnosis, patient education or anything else meaningful.  Instead, MGB providers often relied on poorly written, in grammar and penmanship, handwritten notes, a prelingually Christopher Emerson himself, the Emerson children, or nothing at all.

### THE HANDWRITING ISN'T JUST ON THE WALL

18. In one handwritten note, a nurse named Chrissy wrote, "I will do the best I can with communicating and I understand how frustrating it is to not have ASL interpreters here on hand to help us out."

19. Another note informs Mr. Emerson, "Front desk is calling interpreter, but they are 'on hold'"

20. Another informs Mr. Emerson that "the interpreter is available after 12pm" and then go on to mention EEG's, radiology, and medications without the benefit of an interpreter for which Mr. Emerson's consent was required.

21. Without appropriate auxiliary aides, Mr. Emerson was forced to give consent on his wife's behalf for treatments he did not and could not understand without an interpreter.

22. This lack of coordination between interpreting services and the treatment team led to notes like one specifically asking, "is it okay to do EKG first?" without explaining the procedure or its purpose.

23. At other times, Mr. Emerson would receive a note like "we are discussing what medications would help her heart rate" with no further detail. Mr. Emerson would not be told, for instance, the risks and rewards of the different medications to which he was being asked to consent.

24. Over and again, the MGB doctors' handwritten notes, written when no interpreter was present, show the failure to provide interpreters when necessary regardless of the amount of services provided and demonstrate there was ineffective communication between MGB providers and the Emersons.

<u>ITS NOT OKAY, I HAVE A NOTE FROM MY DOCTOR</u>

25. These doctors include Dr. Martin Rosenthal who explained his examination, made to determine if emergency surgery of Mrs. Emerson's abdomen was necessary, in a note reading simply, "feels ok."

26. Dr. Petra Simic explained the need for dialysis writing, "I am Dr. Petra Simic, kidney doctor [in barely legible handwriting], too much fluids – NEEDS DIALYSIS."

27. Dr. Kidner explained that dialysis was unnecessary writing to Mr. Emerson, on a paper towel, "if running with dialysis will cause her health down."

28. These contradictory notes left Mr. Emerson scared and confused and without any opportunity to inquire about the differing opinions.

29. Dr. Takvorian wrote, "I know she is very sick if her breathing worsens, would she want to be intubated (breathing tube?)"  There is no further explanation of either intubation, a breathing tube, the risks involved or the purpose of such intervention.  There is no reason for Dr. Takvorian to believe Christopher Emerson would understand the critical terms – intubated or breathing tube – and no explanation of what choice, if any, Christopher had to make or the risks involved.

ANY QUESTIONS?  NO?  GOOD

30. Various doctors concluded their short notes with "Any ?'s" of "Q's" as if Mr. Emerson had a way of understanding the information given to him or to ask the questions he might have.

31. Mostly, though, Mr. Emerson wasn't given enough information from which to derive questions.  One note, describing a medical team discussion states, "they talk about how the day went.  Do you have questions for them?" and is devoid of any pertinent medical information about how the day went or even, in lay terms, how the day did, in fact, go.

THE DEAF HUSBAND AS INTERPRETER

32. Even knowing Mr. Emerson was, himself, prelingually Deaf and communicated via American Sign Language, MGB doctors asked him, because no interpreter was available, to interpret for his wife.

33. One unsigned note by a MGB doctor reads, "can you help me explain to her that I want to examine?"

34. At this point, Glenys was, essentially, blind as well as Deaf.

THE CHILDREN AS INTERPRETERS

35. Other doctors relied upon the Emerson children to act as interpreters.  One note written by Mr. Emerson reads, "what is she saying?" as medical personnel discuss Mrs. Emerson's treatment with the Emerson children, ages 14 and 11, as Mr. Emerson stands by unable to understand the conversation.

## THE COMPLAINTS AND REQUESTS

36. Mr. Emerson repeatedly requested interpreters to be present at times when there would be, for instance, interactions with doctors as opposed to having interpreters simply in the room having a coffee during hours when nothing, essentially, was occurring.

37. At one point, in response to Mr. Emerson begging for an interpreter, a MGB staffer responded with a note reading, hopefully unironically, "I hear what you are saying  I am working on a system to make this easier for Glenys + you"

38. In another note, Dr. Black informed Mr. Emerson that "we will file a complaint about not having enough interpreters." She also informed Mr. Emerson that a "safety report" would be filed.

39. Neither a complaint nor a safety report were found in a review of Glenys' medical record.

## AND THEN, OF COURSE, THERE'S NOTHING

40. At one point, after waiting 1.5 hours for an interpreter to assist with transferring Glenys to the ICU, after an apparent emergency with another Deaf patient in another part of the hospital, the interpreter, who had just arrived, left abruptly leaving Mr. Emerson again alone to try to understand the ICU nurses.

41. Despite its own study showing the lack of understanding of the ADA and accommodations, the defendant maintains they provided adequate and even "extraordinary" services to the Emersons thus making this lawsuit necessary.

## FACTS ABOUT COMMUNICATION WITH THE DEAF AND HARD-OF HEARING

42. According to the Center for Disease Control, "[a]bout 40% of the sounds in the English language can be seen on the lips of a speaker in good conditions — such as a well-lit room ... But some words can't be read. For example: "bop", "mop", and "pop" look exactly alike when spoken. (You can see this for yourself in a mirror). A good speech reader might be able to see only 4 to 5

words in a 12-word sentence." https://www.cdc.gov/ncbddd/hearingloss/language.html (last visited 8/16/2022).

43. To put the previous paragraph into context, this is what lipreading 5 of every 12 words of that paragraph might look like spoken to a Deaf person trying to lip read:

> According the Control, "[a]bout sounds the English can be on the speaker in good— room ... some can't read. For example: "", "", and "" exactly alike when. (You this for in a mirror). A speech might be to see only 4 to 5 in a 12-word."

44. It is difficult, in any given situation, to know what words might be lipread and which might not, but, in the above example, for purposes of demonstration, the "important" words were left in the example even though those are, as they are less commonly used and seen in everyday conversation, the words least likely to be understood.  More than that, more than 5 words of each 12-word sequence were left in the example.

45. Studies by Gallaudet University, The University for the Deaf in Washington D.C., demonstrate the average reading level for an 18-year-old high school graduate, who happens to be deaf, hasn't changed much in the last 50 years, remaining stable between a third and fourth grade level. To put that into context, the average newspaper, online or otherwise, in the United States is written at an 11th grade level. The largest American Sign Language Dictionary holds some 5,600 words, while the Oxford English Dictionary has 500,000.

## ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

46. As described more fully above, Defendant's denial of effective communication during the medical treatment of the Emerson family caused the Plaintiffs significant pain, suffering and emotional distress.  Due to Defendant's refusal to provide effective communication, Christopher Emerson did not meaningfully understand critical information about diagnoses, prognoses, medication and/or treatment options regarding his wife and children.  The Emersons were forced to sign consent forms and undergo procedures and treatment without understanding the risks and benefits thereof.  The Emersons were also sent home from MGB without a complete or adequate

understanding of the instructions for follow up care of the relevant patient or of their prognosis for future improvement, complications, or relapse thereby causing significant emotional harm, anxiety and confusion.

47. Defendant knowingly limited Plaintiffs to the little communication the Plaintiffs could achieve through vague gestures, cryptic notes, and the few words Plaintiffs could understand through reading lips or by what could be understood by an 11 or 14 year old child.

48. Reliance by Deaf and hearing impaired individuals upon family members to interpret medical communications for them is unwise and dangerous. Such family members are generally not trained to act as interpreters, particularly in medical and hospital settings. Family members often are untrained in accurately and precisely interpreting and conveying for and to the hearing-impaired individual the complete and accurate content of medical communications. In addition, family members are generally too personally and emotionally involved with the hearing-impaired patient to act impartially and with the emotional detachment that is necessary for qualified sign language interpreters, particularly in medical settings and communications.  Of course, when those family members are only 11 and 14 years old, all those problems are only compounded or, as here, is a Deaf individual.

49. As a result of Defendant's failure to ensure effective communication with Plaintiffs, Plaintiffs received care and service that was objectively substandard and that is inferior to care provided to patients and patient family members who can hear.

50. Furthermore, despite MGB's knowledge and understanding of its legal obligation to provide adequate and effective communication to the Plaintiffs, and its knowledge and understanding that the failure to provide adequate and effective communication to Plaintiffs could and would result in denial of Plaintiffs' rights under law and in serious and material harm and injury to Plaintiffs, especially the minor Plaintiffs, Defendant knowingly, intentionally and maliciously failed and/or refused to provide adequate and effective communication to Plaintiffs in an intentional and/or deliberately indifferent violation of Plaintiff's rights.

51. It is reasonably foreseeable that each Plaintiff will continue to visit one or more of Defendant's facilities, either by choice or necessity, due to the ubiquity of Defendant's facilities, affiliates and the proximity of those facilities to the Plaintiffs' homes or neighborhoods.

52. Based on the foregoing, on information and belief, the actions and omissions of Defendant resulting in harms to Plaintiffs were willful, malicious, intentional, recklessly indifferent and undertaken with an evil mind and motive and with disregard for and deliberate indifference to the legal rights of Plaintiffs under federal and state law and the substantial risk of serious and material harms to the Plaintiffs. Therefore, to the extent allowed by any applicable law, Defendant's actions would warrant, in addition to all other appropriate relief, the imposition of punitive, exemplary damages, or enhanced compensatory damages for its wrongful conduct and to deter other similarly situated persons or entities from similar future conduct.

## FEDERAL CLAIMS

### COUNT I

### DEFENDANT VIOLATED TITLE III OF THE AMERICANS WITH DISABILITIES ACT

53. Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

54. Plaintiff Christopher Emerson is substantially limited in the major life activity of hearing and his children are related to individuals so limited.  Accordingly, they are considered individuals with a disability as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

55. Defendant owns, leases, and/or operates a place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(F).  Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations…" 42 U.S.C. § 12182(a).

56. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§36.202.

57. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation shall furnish appropriate auxiliary aids and services to ensure effective communication with individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(b)(1).

58. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation, in choosing the type of auxiliary aid or service to ensure effective communication, must consider the "method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii).

59. Pursuant to Title III of the ADA and its implementing regulations, in order to be effective, the type of auxiliary aid or service provided by the public accommodations "must be provided in accessible formats, in a timely manner, in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii).

60. As described more fully above, Defendant discriminated against the individual Plaintiffs on the basis of their disabilities by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and/or accommodations of their place of public accommodation and equal opportunity to participate in and benefit from Defendant's health care services in violation of 42 U.S.C. §§ 12181, et seq.

61. Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters. On information and belief, the refusal to offer in-person interpreter services is as a result of a policy or practice of Defendant to discourage the use of in-person interpreters as well as a failure to properly train its physicians as to any and all aspects of the ADA.

62. As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs

suffered harm as set out above.

## COUNT II

## DEFENDANT VIOLATED SECTION 504 OF THE REHABILITATION ACT

63. Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

64. Plaintiffs are substantially limited in the major life activity of hearing or are close relatives to those so limited.  Accordingly, they are individuals with a disability as defined under Section 504, as amended, 29 U.S.C. § 708(20)(B).

65. During all relevant times, Defendant was and continues to be a recipient of federal financial assistance, including, but not limited to, its acceptance of Medicare and Medicaid.

66. Pursuant to Section 504, "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…"  29 U.S.C. § 794.

67. Defendant has discriminated and continues to discriminate against Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and the benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

68. Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters, the use of minor children as interpreters, the use of Deaf person as an interpreter, and in the other manners described more fully above and throughout this Complaint.

69. Defendant has discriminated and continues to discriminate against the Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services

necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

70. As a result of the Defendant's failures, as described above and throughout this Complaint, the individual Plaintiffs have suffered and will continue to suffer mental anguish, fear, isolation, suffering, embarrassment, and humiliation.

71. As proximate result of the Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT III

### DEFENDANT VIOLATED THE ADA 42 USC § 12182(B)(1)(E) AND THE REHABILITATION ACT OF 1973 § 505(a)(2), 29 U.S.C.A. § 794(a)(2) BY ENGAGING IN ASSOCIATIONAL DISCRIMINATION AGAINST THE EMERSON CHILDREN

72. Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

73. Both the Rehabilitation Act and the ADA prohibit discrimination against those associated with someone with a qualifying disability.  42 U.S.C. § 12812 states; "It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship of association."

74. Christopher Emerson and Glenys Emerson are both qualified as disabled individuals under both Acts and their children, Gabriella and Christopher B., are persons aggrieved as defined by the Acts.

75. By forcing untrained, unlicensed, emotionally upset minor children to act as interpreters, the Defendant violated both the ADA and the Rehabilitation act proximately causing harm to these plaintiffs.

76. As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully pray that this Court grant the following relief against the Defendant:

A. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973;

B. Permanently enjoin Defendant from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from, Defendant's services or which deny Plaintiffs effective communication with Defendant. This includes entering a permanent injunction ordering Defendants:

   a. To cease discrimination against Plaintiffs and other Deaf or Hard-of-Hearing patients and their families;

   b. To promulgate and comply with policies and procedures to ensure that Defendants and their staffs do not discriminate against individuals who are deaf and hard of hearing;

   c. To promulgate and comply with procedures to ensure that Defendants will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by Defendants;

   d. To promulgate and comply with procedures to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide sign language interpreters, TTYs and/or other communication services to ensure effective communication with deaf or hard of hearing persons;

C. Schedule a trial by jury;

D. Enter a judgment in favor of Plaintiffs awarding any and all relief available under law to the maximum extent allowed by common law, state and federal statutes, and the Constitution of the United States of America, including but not limited to the following:

   a. Compensatory damages;

      b. Enhanced Compensatory damages;

      c. Punitive damages;

      d. Reasonable costs, interest and attorneys' fees; and,

E. Award any and all other relief that may be just, necessary and appropriate.

Respectfully submitted,

The Emerson Family

By their attorney,

RED SNEAKER LAW, PLLC.

Dated:  August 19, 2022           By:*/s/* Kirk C. Simoneau (#19291)
PO Box 1216
Amherst, NH 03031
603.336.2028
*kirk@redsneakerlaw.com*